**Charles BAXTER, Plaintiff,**

v.

**CITY OF BELLEVILLE,
ILLINOIS, Defendant.**

No. 89–3354.

United States District Court,
S.D. Illinois.

Aug. 25, 1989.

John R. Hammel, ACLU, Chicago, Ill., Thomas E. Kennedy, III, Land of Lincoln Legal Assistance Foundation, East St. Louis, Ill., for plaintiff.

Robert Sprague, Belleville, Ill., Kevin L. Blaine, Coppinger, Carter, Schrempf & Blaine, Alton, Ill., for defendant.

## MEMORANDUM AND ORDER

STIEHL, District Judge:

This matter is before the Court on plaintiff's motion for preliminary injunction. Plaintiff, Charles Baxter, seeks injunctive relief against the defendant, City of Belleville, Illinois (City), requiring the City to allow Baxter to open a residence intended to house persons with Acquired Immune Deficiency Syndrome (AIDS). Baxter claims that his rights under the Fair Housing Act, 42 U.S.C. § 3601, et seq. (FHA), and the Fourteenth Amendment have been violated by the City's refusal to grant him a special use permit for the property in question.

### I. BACKGROUND

On March 27, 1989, Baxter filed an application with the Belleville Zoning Board for a special use permit for a residence he desires to establish in the City of Belleville to provide housing for AIDS infected persons. On April 27, 1989, the Zoning Board voted to recommend that Baxter's request be denied. That recommendation was then presented to the Belleville City Council at its May 15, 1989 meeting. Baxter's re-

quest for a special use permit was denied by a 9 to 7 vote of the Council.

Baxter filed his complaint for declaratory and injunctive relief on June 13, 1989. This Court heard evidentiary testimony on the motion for preliminary injunction, after which it ordered the parties to file post-hearing memoranda.

## II. FINDINGS OF FACT

Upon review of the record, the Court finds, based on the evidence adduced at the hearing, the following:

### A. BAXTER'S REQUEST FOR A SPECIAL USE PERMIT

#### 1. APPLICATION

On March 22, 1989, Baxter signed a one-year lease as lessee for the property known as 301 South Illinois Street, Belleville, Illinois. The lease contained an option for a one-year renewal, as well as an option to purchase.

After experiencing some difficulty over an acceptable corporate name, Baxter formed a not-for-profit corporation named Baxter's Place to operate the property. He called the residence he hoped to establish: "Our Place."

On March 27, 1989, Baxter filed an application for a special use permit for the property. On the application under paragraphs 3(a) which requests the applicant to detail the "nature of the proposed use, ... the type of activity, manner of operation, number of occupants ... ", Baxter listed the following:

1. Hospice for Terminally Ill Patients
2. Structured supervision
3. limited excess [sic] to public
4. No more then [sic] 7

Baxter, on the advice of counsel, who also was a lessor of the property, changed the first listing from "Hospice for AIDS care" to "Hospice for Terminally Ill Patients." Under that part of the application entitled "Recommendation of Zoning Administrator," the following appears:

If such a facility is needed in Belleville, this property would serve the purpose.

S/Stan Spehn

## 2. ZONING BOARD HEARING

The Zoning Board hearing was held on April 27, 1989. Baxter's counsel made a lengthy presentation to the Board including traffic and parking impact, availability of local medical facilities, current zoning of the property and a description of the location. She told the Board that no one in the area opposed the special use request. Copies of an exchange of letters between Hospice of Southern Illinois and Baxter were presented to the Board with respect to the use of the term "hospice." However, not until the end of the presentation to the Zoning Board was it revealed that the residents of Our Place would be AIDS patients.

The Board members asked Baxter a number of questions, including whom he intended to house in the facility. Baxter told the Board that he would be housing AIDS patients. The majority of the questions asked of Baxter concerned the members' fear of AIDS. The questions included: how potential residents would be screened; supervision of the residents; effect on the junior high school across the street; how Baxter would handle sanitation, including disposal of body fluids; why he chose Belleville for the residence; needs in Belleville for such a residence; and, whether Baxter, himself, was homosexual or had tested positive for the Human Immunodeficiency Virus (HIV).

Baxter informed the Board of his extensive history of providing in-home care for critically ill patients, including AIDS patients in the final stages of their disease. He spoke of three persons in Belleville who were HIV-infected and homeless and of Red Cross statistics to the effect that there are 3000 HIV-positive cases in Madison and St. Clair Counties. He also told the Board that he personally had spoken with the Superintendent of Schools about his plans for Our Place, and that the Superintendent had said that he had no problem with the residence plans. Baxter told the Board that AIDS persons deserved to live with dignity so that they could die with dignity.

Two persons then spoke on behalf of Our Place. One was a person with AIDS, and the other was the sister of an AIDS patient whom Baxter had cared for until his death.

Our Place is located in the 6th Ward, and both 6th Ward aldermen were present at the hearing. No opposition was raised by any member of the audience. The Board voted unanimously to recommend to the Board of Aldermen that Baxter's request for special use permit be denied.

The City designated Frank Heafner, one of the members of the Zoning Board, to testify on behalf of the Zoning Board. He testified that one of the important reasons the Board recommended denial of the permit was that Our Place would be close to a junior high school. The Board was also concerned with the potential change in property values in the area, and that people might stay away from that part of Belleville. He also stated that the Board was concerned with Baxter's lack of qualifications and they were uncertain how he was going to accomplish his plans. Heafner testified that it was the belief of the Board that Baxter would need more training, although he was not able to say exactly what training would be necessary to satisfy the Board's concerns. The Board members also expressed concern about the potential spread of AIDS through residents who might be intravenous drug users and homosexuals.

Heafner testified that he did not recall that the Board made any actual determinations with respect to the following, although these factors were listed on the advisory report of the Zoning Board:

A. The proposed variance is not consistent with the general purposes of this Ordinance; and,

B. Strict application of the district requirements would not result in great practical difficulties or hardship to the applicants, and would not prevent a reasonable return on the property; and,

C. The proposed variance is not minimum deviation from such requirements that will alleviate the difficulties and hardship and would not allow a reasonable return on the property; and,

D. The plight of the applicants is not due to peculiar circumstances; and,

E. The peculiar circumstances engendering this variance request are applicable to other property within the district, and therefore, a variance would not be an appropriate remedy; and,

F. The variance, if granted, will alter the essential character of the area where the premises in question are located, and materially frustrate implementation of the municipality's comprehensive plan.

### 3. CITY COUNCIL MEETING

The Belleville City Council considered Baxter's request for a special use permit at its regular meeting held May 15, 1989. Alderman Koeneman of the 6th ward, where 301 South Illinois is located, made a motion to overturn the recommendation of the Zoning Board. The motion was seconded by Alderman Seibert, of the same ward.

Because there were a number of questions from the aldermen, Mayor Brauer requested and received permission from the Council for Baxter to respond to the questions. (No member of the public is permitted to speak at a Council meeting without formal approval by the Council.) Thomas Mabry, a Belleville alderman, was designated by the City to testify on behalf of the City Council. He stated that the majority of the questions from the aldermen were addressed to how the facility would be run and concerns of the aldermen about AIDS. He also testified that the City Council was concerned with the fact that Our Place would affect property values; that many of the residents would be intravenous drug users; and that the facility is located across the street from a junior high school.

Mabry stated that the main factors in his voting to refuse the special use permit were: (1) Baxter did not convince him that Baxter had the ability to run or fund the facility; (2) Baxter did not have sufficient medical or counseling background to run the facility; (3) Baxter did not have a plan for proper sanitation, specifically, disposal of items that would come into contact with the AIDS virus; and, (4) his major concern was the location of the residence—in a

commercial area, in close proximity to both a junior high school and a grade school.

He also testified that he understood Baxter's intent to be to establish a residence for seven HIV-infected persons, but that during the meeting Baxter changed the number of prospective residents to four, of whom only two could be in the critical stages of the disease. Mabry admitted that he did not know of Baxter's medical background.

Mabry has served on both the City Council and the Zoning Board. He stated that the Council generally votes unanimously, and if the two aldermen for the ward in which the applicant property is located vote in favor of a variance, special use permit, or other zoning change, the other aldermen will vote with them. Mabry further testified that he could not recall an instance in which a request that was supported by the two aldermen of the ward in which the property was located had been denied by the Council.

Arthur Baum, Belleville City Clerk, testified that he was present at the City Council meeting, and confirmed Mabry's testimony as to the nature of the questions asked by the aldermen, and their concerns. Baum understood Baxter's intended use of the facility to be for the housing of terminally ill AIDS patients in the last stages of their disease. He stated that no one on the Council referred to any medical authorities or experts, and that to his knowledge none were consulted by the Council. He further testified that there was no specific determination by the Council as to the health and safety issues, although the vote indicated the Council's position. Baum testified that the aldermen made it clear that they were concerned about and feared the spread of HIV into the community if Our Place were allowed to open.

Baum testified that he has been City Clerk for ten years, and that he does not know of any other instance during that time when the Council voted against a request supported by the two aldermen of the ward in which the property was located.

## B. BAXTER'S MEDICAL BACKGROUND

Baxter has been a home healthcare provider for fifteen years. His general responsibilities included bathing, feeding, hygiene, administering all medications but injections, cleaning and dressing sores, changing linen, laundry duties, and cooking. He receives referrals from social workers and nursing agencies and is registered with a number of health-care organizations. Among those he has cared for were three AIDS patients in the last stage of the disease.

He became interested in caring for AIDS patients in 1987. Since that time has has received training in AIDS patient care from St. Elizabeth's Hospital in Belleville. He studied with an infectious control nurse on obstruction of the virus, self-protection and hygiene. As part of this study, he received written materials on AIDS to review. He also received instruction on the proper terminology related to HIV infections, clinical analysis, methods of transmission and elimination of the risk of transmission. He has completed the first two parts of three of an organized training program on AIDS at St. Elizabeth's. He did not complete the third part because he left to care for an AIDS patient.

## C. MEDICAL EVIDENCE

Plaintiff's expert, Robert L. Murphy, M.D., testified at length and in great detail as to the genesis, transmission and physiological development of the Human Immunodeficiency Virus, commonly referred to as "HIV." Dr. Murphy is a full-time Assistant Professor at Northwestern University Medical School, and is the Director of the AIDS Clinic and AIDS Clinical Research and Treatment Facility at Northwestern Memorial Hospital, Chicago, Illinois. He is a clinical coordinator for the AIDS Biopsychosocial Center at Northwestern University Medical School and Director of the Sexually Transmitted Disease Clinic at Memorial Hospital. He is also a medical consultant to the Center for Disease Control—Midwest Regional STD (Sexually Transmitted Disease) Training Cen-

ter. The Court finds that Dr. Murphy is qualified as an expert in the field of sexually transmitted diseases.

The City did not attempt to refute or rebut Dr. Murphy's testimony by offering its own expert. The Court, therefore, makes the following findings with respect to HIV, and its transmission:

1. The Human Immunodeficiency Virus—Strain 1, a retrovirus, was not known in the United States before 1977. The identification of the virus did not occur until 1984. The difficulty in identifying the virus and its relationship to AIDS has resulted in some confusion as to the proper nomenclature. AIDS is the end of the spectrum of the HIV infection, and was the name originally given to the disease by the National Center for Disease Control in Atlanta (CDC) before scientists knew that the source of AIDS was HIV infection. The CDC is the largest epidemiological center in the world, and is responsible for tracking three dozen different diseases. HIV is the largest scientific study at the CDC.

2. There are only three known methods of transmission of the HIV infection: through the exchange of body fluids in sexual intercourse; exposure to infected blood products; and, transmission interutero from an infected mother to a fetus, or, after birth, through breast milk. Except for transmission through breast milk, all are well-documented.

3. HIV is a very difficult virus to transmit. The virus is encapsulated in a fragile "envelope." It cannot survive outside of white blood cells, and if exposed to the air, it will die. Soap, 130°F tap water and common household detergents all kill the virus. The disease is even difficult to transmit during intercourse. The transmission rate of HIV is 1 in 500 sexual encounters, in comparison to the transmission rate of gonorrhea, 1 in 4, and in herpes, 1 in 2 exposures with active lesions.

4. The risk of infection from exposure to blood products is highest among healthcare providers, primarily resulting from penetrating blood contact through needle punctures or blood splash. The CDC places the risk of transmission to healthcare providers at a rate of .004 of individuals exposed to contaminated blood. Of the 15 million healthcare providers in the United States, there are only 16 documented cases of HIV infection from exposure at work. The CDC has further determined that other individuals who are subjected to infected blood are at no risk of infection. This includes police officers and paramedics. In addition, since the HIV antibody test became available in 1985, there has been no medical evidence of transmission of the virus among household members with an HIV-positive resident. There also is no medical evidence of transmission through saliva.

5. An HIV-positive individual is infectious from the first day of contracting the disease, and immunological deterioration begins on the first day of his becoming infected with HIV. However, there may be a long period of time after contracting HIV when the patient feels fine and is typically asymptomatic. At some point, however, the immune system becomes implicated and symptoms occur. In addition, once the immune system has sufficiently broken down, a host of opportunistic tumors and infections may occur within other systems, e.g., the lymph-nodes system and spleen may be infected; brain tissue can inflame, causing dementia; and, the reproductive system may be infected, all due to the diminished immunity in the HIV-infected person. It is at this point that the disease has progressed to one of the diagnostic stages of either AIDS Related Complex (ARC) or AIDS.

6. The depressed immune system of the HIV patient makes him vulnerable to infection from ubiquitous bacterium, fungi and virus. In the HIV patient, these commonly occurring organisms are able to overrun the HIV patient's weakened body system. The most common of these infections are pneumocystis carinii pneumonia (PCP); cytomegalovirus (CMV) which may lead to blindness; cryptococcus which causes inflammation of the meninges leading to meningitis or dementia; and mycobacterium avium-intracellular (MAI) which is related to tuberculosis. All of these infec-

tions, except MAI, are ubiquitous, are not transmitted from one person to another, and are commonly present in nature. MAI, although infectious, is easy to diagnose and, with therapeutic treatment is rendered non-communicable within two weeks.

7. The CDC has set forth policy guidelines of universal precautions to be used by healthcare providers. The precautions necessary for HIV households, however, are minimal, and include the use of disposable gloves and disinfection of blood and body fluid spills with diluted bleach.

Based on the conclusive medical evidence presented, the Court finds that persons who are HIV-positive pose no risk of its transmission to the community at large.

### D. BAXTER'S INTENDED USE OF OUR PLACE

It is evident from Baxter's testimony that his intention for Our Place, has, from its inception, been to offer housing to persons who are HIV-positive, homeless, and in the later stages of the disease, but still able to care for themselves. However, throughout the evidentiary hearing the parties used the terms "AIDS" and "HIV-positive" interchangeably, although it is clear from the medical evidence before the Court that not all persons who are HIV-positive have progressed to the AIDS stage of the disease. In an effort to minimize confusion with respect to the Court's discussion of this deadly disease, it will be referred to as HIV, understanding AIDS to be included in that term.

### III. CONCLUSIONS OF LAW

### A. STANDARDS FOR INJUNCTIVE RELIEF

■ The key case in this circuit on the standard for injunctive relief is *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380 (7th Cir.1984). While there are more recent cases, i.e. *American Hosp. Supply v. Hospital Prod. Ltd.*, 780 F.2d 589 (7th Cir. 1985) and *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986), *Roland* acts as the foundation upon which these cases build their decisions. In order to succeed in his application, therefore, plaintiff must meet the test set forth in *Roland*.

The *Roland* test has been reduced to four required showings:

To obtain a preliminary injunction, a plaintiff must show: (1) that he has no adequate remedy at law or will suffer irreparable harm if the injunction is denied; (2) that the harm he will suffer is greater than the harm the defendant will suffer if the injunction is granted; (3) that the plaintiff has a reasonable likelihood of success on the merits; and (4) that the injunction will not harm the public interest.

*On/TV v. Julien*, 763 F.2d 839, 842 (7th Cir.1985). The district court has broad discretion to grant or deny the injunctive relief sought, and that decision will be overturned only upon a showing that the Court abused its discretion. *Burlington N. R.R. v. Bhd. of Maintenance of Way Employees*, 793 F.2d 795, 804 (7th Cir.1986), *aff'd*, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987).

The City asserts that injunctive relief is unavailable in this action because Baxter seeks relief other than to preserve the status quo. In support of these propositions, the City relies on *Chalk v. United States Dist. Ct., Cent. Dist. of Calif.*, 840 F.2d 701 (9th Cir.1988). However, the injunctive relief standard of the Ninth Circuit is not controlling. In *Roland* the Seventh Circuit stated that the element of preservation of the status quo is "ambiguous." 749 F.2d at 383. The court noted that in a preliminary injunction the status quo may be both preserved in one sense yet changed in another. *Id.* The Court acknowledges that the more common situation in which injunctive relief is sought involves restraining certain acts of the defendant. The Court's equitable remedies are not, however, restricted to merely prohibitions. Among the Court's equitable powers is the power to require affirmative action, also known as mandatory injunctive relief.

Mandatory injunction is defined by *Black's Law Dictionary* as follows:

Mandatory injunction. One which (1) commands the defendant to do some pos-

itive act or particular thing; (2) prohibits him from refusing (or persisting in a refusal) to do or permit some act to which the plaintiff has a legal right; or (3) restrains the defendant from permitting his previous wrongful act to continue operative, thus virtually compelling him to undo it.

*Black's Law Dictionary,* 705 (5th Ed.1979).

The relief plaintiff seeks is to prohibit the City from continuing to refuse to permit the plaintiff to be allowed to open Our Place. Mandatory injunctions are common in FHA and Rehabilitation Act cases. *See, e.g., Robertson v. Granite City Community Unit School Dist. 9,* 684 F.Supp. 1002 (S.D.Ill.1988); *Doe v. Dolton Elementary School Dist. No. 148,* 694 F.Supp. 440 (N.D. Ill.1988); *United States v. Housing Authority of City of Chickasaw,* 504 F.Supp. 716, 734–36 (S.D.Ala.1980); *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 553 (W.D.Va.1975). Furthermore, § 3613(c) provides, in part, that the equitable relief available under the FHA includes "an order enjoining the defendant from engaging in such practice *or ordering such affirmative action as may be appropriate.*" (Emphasis added).

### B. LIKELIHOOD OF SUCCESS ON THE MERITS

The Seventh Circuit has stated that of factors to be considered, the likelihood of success on the merits usually weighs most heavily in a court's determination. *O'Connor v. Bd. of Educ.,* 645 F.2d 578 (7th Cir.) *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). Where the court stated: "The likelihood of success factor serves as a threshold requirement … if this factor is unsatisfied, and if the plaintiff has not shown irreparable injury, the court need go no further in denying the preliminary injunction." 645 F.2d at 580. Plaintiff need only show that his chances of succeeding on the merits are more than negligible. The greater that showing, the less the balance of harms need weigh in his favor. *Roland,* 749 F.2d at 387.

### 1. *Baxter's Standing to Sue*

Before reaching the merits of the injunctive relief sought, the Court must first be persuaded that the plaintiff has standing to bring this action. In determining whether plaintiff has standing to bring this action, the Court must find that he is "entitled to have the Court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). Standing has two aspects. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). The first aspect is jurisdictional. Article III of the Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies." "The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the Court's judgment may benefit others collaterally." *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

Second, to find standing, the Court must also determine whether "as a prudential matter," the petitioner is a proper proponent "of the particular legal rights on which [he] base[s] [his] suit." *Singleton,* 428 U.S. at 112, 96 S.Ct. at 2873. Prudential considerations will require that a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. Moreover, litigants do not have standing when the asserted injury "is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Id.* These prudential considerations relate to the well-established judicial preference to avoid unnecessary constitutional adjudication. *Singleton,* 428 U.S. at 124, 96 S.Ct. at 2879, (Powell, J., concurring in part and dissenting in part); *Ashwander v. TVA,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

In his complaint, Baxter asserts that the City of Belleville "has refused to allow plaintiff to open a residence for persons with AIDS who need a home, and thus violated *plaintiff's* rights under the federal

Fair Housing Act, 42 U.S.C. Section 3601, *et seq.*, and the Fourteenth Amendment." (Emphasis added).

### (a) *Fair Housing Act*

Sections 3601, et seq. of the FHA are amendments to the Act which became effective March 12, 1989. Among the stated purposes for the amendments were the Congressional interest in expanding the Act to allow private litigants the right to challenge alleged discriminatory housing practices, and including handicapped persons among those protected by the Act. H.R.Rep. No. 100–711, 100th Cong.2d Sess. 13, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2174.

Plaintiff asserts that his rights under § 3604(f)(1) and § 3617 have been violated by the City's refusal to grant him a special use permit and thereby allow him to open the residence to house up to seven persons with AIDS.

Section 3604(f)(1) makes it unlawful:

To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

Section 3617 provides:

Interference, coercion, or intimidation; enforcement by civil action

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.

Some courts have held that success under § 3617 is not contingent upon a finding that plaintiff also has sufficiently alleged a cause of action under § 3604. *See, e.g.*

*Scott v. Greenville Co.*, 716 F.2d 1409 (4th Cir.1983); *In re Malone*, 592 F.Supp. 1135 (E.D.Mo.1984), *aff'd without opinion*, 794 F.2d 680 (8th Cir.1986). However, in a footnote, the Seventh Circuit has stated:

One court has held that a violation of section 3617 can be established without first establishing a violation of sections 3603, 3604, 3605, or 3606 because to interpret section 3617 otherwise would make it superfluous. *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489, 497–98 (S.D.Ohio 1976). We decline to decide whether section 3617 can ever be violated by conduct that does not violate any of the four earlier sections. We do hold, however, that under the circumstances of this case, where the conduct that allegedly violated section 3617 is the same conduct that allegedly violated section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the failure to rezone violated section 3604(a).

*Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1288 n. 5 (7th Cir.1977), *on remand from* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

Because Baxter's claims under both § 3604 and § 3617 are founded on the same conduct or acts of the City, under the holding in *Arlington Heights*, for Baxter to have standing under § 3617, the Court must first be persuaded that he has standing under § 3604. Accordingly, the Court will first look to Baxter's standing to sue under § 3604(f)(1). The main thrust of section (f)(1) is to prohibit discrimination in housing based upon handicap. Therefore, the Court must determine whether persons infected with HIV are handicapped within the meaning of the statute.

#### (i) Determination of Handicap Under the Act

Section 3602(h) defines handicap as follows:

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance as defined in section 802 of Title 21.

The 1988 amendments to the FHA were modeled on the Rehabilitation Act of 1973. The legislative history of the 1988 amendments provides:

Coverage of Handicapped Persons

H.R. 1158 includes handicapped persons as a protected class. Handicapped persons have been protected from some forms of discrimination since Congress enacted the Rehabilitation Act of 1973, and the bill uses the same definitions and concepts from that well-established law. In the 1980 Fair Housing bill, Congress also included protections for individuals with handicaps.

Prohibiting discrimination against individuals with handicaps is a major step in changing the stereotypes that have served to exclude them from American life. These persons have been denied housing because of misperceptions, ignorance, and outright prejudice.

1988 U.S.Code Cong. & Admin.News at 2178.

It is clear from its legislative history that Congress intended to include among handicapped persons those who are HIV-positive.

The Fair Housing Amendments [sic] Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

. . . .

People with Acquired Immune Deficiency Syndrome (AIDS) and people who test positive for the AIDS virus have been evicted because of an erroneous belief that they pose a health risk to others.

All of these groups have experienced discrimination because of prejudice and aversion—because they make non-handicapped people uncomfortable. H.R. 1158 clearly prohibits the use of stereotypes and prejudice to deny critically needed housing to handicapped persons. The right to be free from housing discrimination is essential to the goal of independent living.

*Id.* at 2179. Although Congress spoke in terms of persons with AIDS and "people who test positive for the AIDS virus," notwithstanding the problems with nomenclature, the legislative history supports a finding that Congress intended to include persons with HIV within the definition of handicapped.

In *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court declined to determine whether a carrier of AIDS, that is an HIV-positive person, would fall within the definition of handicap under the Rehabilitation Act. 480 U.S. at 282 n. 7, 107 S.Ct. at 1128 n. 7. The plaintiff in *Arline* was a tuberculosis victim, and not HIV-positive. Subsequent courts, however, have addressed the application of the Rehabilitation Act to persons with HIV, and have found that those with ARC and AIDS are handicapped under the Act.

Chief Judge Foreman of this District has previously held that a seven year old student with ARC was handicapped within the meaning of the Rehabilitation Act of 1973. *Robertson,* 684 F.Supp. at 1006–07. Similarly, the district court in *Dolton,* 694 F.Supp. at 445, held that a student with AIDS is handicapped and entitled to the protection of the Rehabilitation Act. In *Dolton,* the court stated: "Surely no physical problem has created greater public fear and misapprehension than AIDS. That fear includes a perception that a person

with AIDS is substantially impaired in his ability to interact with others, e.g., to attend public school. Such interaction is a major life activity." 694 F.2d at 444. Similarly, the inability to reside in a group residence due to the public misapprehension that HIV-positive persons cannot interact with non-HIV-infected persons adversely affects a major life activity. The Court therefore finds that persons who are HIV-positive are handicapped within the meaning of the FHA.

(b) *Application of § 3604(f)(1)*

█ In light of the evidence adduced at the hearing, it cannot be said that Baxter is, himself, infected with HIV. Therefore, § 3604(f)(1)(A) is not applicable in this action.

A more difficult question is whether Baxter has standing under (f)(1)(B). The precise language of subsection B prohibits discrimination due to the handicap of "a person residing in or intending to reside in that dwelling after it is so sold, rented or made available." Baxter proceeds alone in this action, and has not been joined as a party plaintiff by a HIV-positive individual who seeks to reside at Our Place.

A number of FHA cases offer some guidance to the Court on the issue of plaintiff's standing to sue. The Supreme Court, in ruling on prior FHA cases, has held that the prudential limitations on standing are not applicable in actions that are brought pursuant to the FHA. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Trafficante v. Metro. Life. Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). This Court recognizes that these cases did not address the specific discrimination allegations raised by Baxter. However, the analyses of the overall intent of the FHA, as well as the broad interpretation the Court has given to the statute, offer valuable guidance to this Court's review of the most recent amendments to the FHA.

In *Havens,* the Court addressed the standing requirements under a related section of the statute and stated: "Thus the sole requirement for standing to sue ... is the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a 'distinct and palpable injury'." 455 U.S. at 373, 102 S.Ct. at 1121, *quoting Warth,* 422 U.S. at 501, 95 S.Ct. at 2206.

In the earlier *Gladstone* opinion, the Court held:

[A]s long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed. The central issue at this stage of the proceedings is not who possesses the legal rights protected by § 804 [codified at § 3604], but whether respondents were genuinely injured by conduct that violates someone's § 804 rights, and thus are entitled to seek redress of that harm under § 812.

441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9.

In the case at bar, Baxter has testified that he has suffered economic injury from the loss of income from tenants due to his inability to go forward with his plans for Our Place. In addition, Baxter testified that he has invested his own money to remodel and repair the building, and for the deposit and rental costs of $1,500 per month. Among the renovations were the installation of a kitchen and window repairs. He further testified that he knows of three persons who are HIV-positive, homeless, and would move into Our Place if it were allowed to be opened. The economic injury Baxter has suffered is sufficient to support a finding that he has met the required Article III injury in fact to raise a case or controversy. *See Arlington Heights,* 429 U.S. at 261–64, 97 S.Ct. at 561–562. Therefore, Baxter has met the first requirement for individual standing. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

The Court further finds that, as a prudential matter, Baxter is the proper proponent of the rights under § 3604(f)(1) on which he bases his suit. *Singleton,* 428 U.S. at 112, 96 S.Ct. at 2873. As Baxter

has standing under § 3604(f)(1), the Court may now address his standing under § 3617. Section 3617 makes it unlawful to interfere with the exercise or enjoyment of a right protected under § 3604. As the Court has determined that the actions of the City violated Baxter's rights under § 3604(f)(1), he may also proceed under § 3617. *Cf. Arlington Heights*, 558 F.2d at 1288 n. 5.

## 2. *301 South Illinois as a Dwelling Under the FHA*

■ The City asserts that Baxter is not entitled to injunctive relief because the property at 301 South Illinois, Our Place, is not a "dwelling" under the FHA. Section 3602 of the FHA defines dwelling as follows:

(b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any building structure, or portion thereof.

(c) "Family" includes a single individual.

The City has questioned Baxter's intended use of the premises. It is readily apparent, however, that Baxter intends to use the structure as a residence for one or more persons. This is evidenced by the fact that Baxter has expended a considerable amount of time and money in redesigning the former office building into a residential structure. Viewing Baxter's intent objectively, the fact that Baxter installed a kitchen in a building which previously lacked such a facility, is evidence that Baxter intends to use the premises as a residence.

The City has relied on *United States v. Mintzes*, 304 F.Supp. 1305 (D.Md.1969), and *Patel v. Holley House Motels*, 483 F.Supp. 374 (D.Ala.1979) to support its assertion that the premises is not a dwelling under the Act. However, the City's reliance on these cases is misplaced. In *Mintzes*, the court held that vacant land, whose structures had been torn down, and which was being held for commercial use was not a "dwelling" under the FHA. This does not apply to the instant action, because the structure here has not been torn down, and the premises is designed for a non-profit residential use, and not a commercial use.

In *Patel*, the court held that a motel was a commercial public accommodation, designed for transient visitors, and was not a residence or a dwelling. As with *Mintzes*, the *Patel* ruling does not apply to this facility which is designed for non-profit residential use, and not commercial public accommodation. Further, the facility is to be used by temporary or permanent inhabitants, and not transient visitors. Finally, the *Patel* court, in quoting *United States v. Hughes Memorial Home*, 396 F.Supp. 544, 548–49 (W.D.Va.1975), notes that a dwelling was a "temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." Baxter has indicated that the facility is to be a home for HIV victims in need of a place to live. Although the length of the residence may vary, the persons who will reside at Our Place will not be living there as mere transients. Thus, the premises may be considered a dwelling.

Accordingly, the premises at 301 South Illinois is within the definition of dwelling as provided by the FHA, and Baxter's claim is subject to consideration under the Act.

## 3. *Evidence of Baxter's Likelihood of Success*

■ Having determined that Baxter has standing to sue under §§ 3604(f)(1)(B) and 3617 of the FHA, the Court now addresses the issue of his likelihood of success on the merits of his claims. As stated earlier, Baxter's required showing is minimal. He need only establish that his chances of succeeding are more than negligible. *Roland*, 749 F.2d at 387.

It has long been recognized that to give full measure to the Congressional purpose behind the FHA, courts have given broad interpretation to the statute. *See, e.g., Havens Realty*, 455 U.S. at 370, 102 S.Ct. at

1119; *Gladstone,* 441 U.S. 91, 99 S.Ct. 1601; *Trafficante,* 409 U.S. 205, 93 S.Ct. 364; *Arlington Heights,* 558 F.2d 1283.

There are two methods of showing a violation of § 3604. The first method is commonly referred to as an "intent" case. That is, plaintiff need only show that the handicap of the potential residents at Our Place, a protected group under the FHA, was in some part the basis for the City's action. *See, e.g., Smith v. Adler Realty Co.,* 436 F.2d 344, 349–50 (7th Cir.1971) (holding that racial motivation need not be the only reason for the decision if it is an element of that decision); *Williamson v. Hampton Management Co.,* 339 F.Supp. 1146 (N.D.Ill.1972).

The evidence adduced at the hearing supports plaintiff's claim that irrational fear of AIDS was at least a motivating factor in the City's refusal to grant Baxter's special use permit. Furthermore, due to that fear, the City's actions were both intentional and specifically designed to prevent persons with HIV from residing at Our Place. Therefore, plaintiff has established a sufficient likelihood of success on the merits with respect to his "intent" case to entitle him to injunctive relief.

In addition, Baxter is likely to succeed on the alternative showing of a § 3604 violation. In *Arlington Heights,* the Seventh Circuit set out a four-pronged test for review of § 3604 causes of action in which the conduct produced a discriminatory effect, but was taken without discriminatory intent. This is known as an "impact" analysis. Although the *Arlington Heights* court was faced with racial discrimination under the FHA, the analysis therein is equally applicable to the 1988 handicap amendments to the FHA, and will be applied by this Court in its review of Baxter's claims. The court held:

Four critical factors are discernible from previous cases. They are: (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

558 F.2d at 1290.

The court divided the first prong into two kinds of discriminatory effects which can be produced in a facially neutral housing decision. "The first occurs when that decision has a greater adverse impact on one [FHA protected] group than on another. The second is the effect which the decision has on the community involved...." *Id.* In this action only the first kind of discriminatory effect is applicable. It is evident that the actions of the City adversely impacted handicapped individuals, persons who are HIV-positive, more than non-handicapped individuals. The intent of Baxter was to open a residence for homeless HIV-positive persons. This group of persons has been adversely impacted each day the residence remains unopened. This form of discrimination is strong because all of the persons adversely affected, with the exception of Baxter, himself, are members of an FHA protected group of handicapped individuals. *Id.* at 1291.

The second prong is the discriminatory intent present in the conduct. The court noted, however, that this factor is the least important of the four in an impact determination. *Id.* at 1292. As previously discussed, it is evident from the testimony of the City's own witnesses that fear of AIDS and a desire to keep persons with HIV out of the Belleville community were, at least, compelling factors in the City's actions.

The third prong is the interest of the defendant in taking the action which produced the alleged discriminatory impact. The City has asserted that it acted pursuant to its legitimate interest in zoning, particularly land use and public health and safety. In support thereof, the City asserts that Baxter failed to demonstrate that he had the background to operate this

facility or that he had a firm plan or program for operating the facility.

The Court acknowledges the City's stated concerns, but finds them to have been a pretext. If the City's true concerns were with Baxter's qualifications or his lack of a firm program or plan, it could have continued the Zoning Board or Council hearings, or both, and given Baxter an opportunity to respond to these concerns. The evidence, however, was substantial that both the Zoning Board and the City Council focused on the perceived threat of HIV and voted accordingly. That the City's actions were based on fear of HIV, and not a legitimate zoning interest, is further supported by the fact that although the two 6th ward aldermen were in favor of the special use permit and moved for its passage, they were outvoted by the Council. The City's witnesses, Baum and Mabry, both testified that they could not recall that ever happening before. Furthermore, no zoning ordinance was cited by the City as a basis for its action.

The final prong of the *Arlington Heights* analysis is the nature of the relief which the plaintiff seeks. Unlike the situation in *Resident Advisory Board v. Rizzo,* 425 F.Supp. 987, 1018 (E.D.Pa.1976) *modified,* 564 F.2d 126 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978), *cited in Arlington Heights,* 558 F.2d at 1291, Baxter is not seeking to compel the City to build public housing for HIV-positive persons, he seeks to be allowed to use available housing provided by him exclusively for a residence for this handicapped group.

Under the *Arlington Heights* analysis, the Court finds that plaintiff is likely to succeed on the merits of his impact claim.

4. *Exclusion Pursuant to § 3604(f)(9)*

■ The City asserts that its actions did not violate the FHA because they were made in accordance with the provisions of § 3604(f)(9). That section provides: "(9) Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." The City contends that Our Place constitutes a direct threat to the health or safety of others. In support thereof the City cites the fact that 301 South Illinois is across the street from a junior high school and near a grade school. In addition, the City focuses on the fact that HIV can be transmitted by illegal drug users, a group specifically excluded from the definition of handicap under § 3602(h).

The Court has found, supra, that the scientific and medical authority is that HIV-positive persons pose no risk of transmission to the community at large. The City has asserted that the risk of secondary infections, to which the HIV-infected individual is subject, pose a substantial health risk. However, of the secondary infections, only MAI is transmissible to the community at large (See discussion, supra). Standing alone, this is an insufficient health concern to warrant the City's refusal to allow Baxter's special use under the exclusion of § 3604(f)(9). Furthermore, the fear that intravenous drug users would pose a threat to the community, under the facts of this case, is unfounded. Baxter testified that he would, through a screening process, not accept current illegal drug users as residents at Our Place. Therefore, the Court finds that the exclusions of § 3604(f)(9) do not support the City's actions.

5. *Likelihood of Success Under § 3617*

The Court has previously found that Baxter has standing under § 3617. Under the provisions of that section of the Act, the Court finds that the evidence supports Baxter's assertion that the City's refusal to allow his requested special use permit constituted an interference with the exercise of his rights under § 3604, as well as the potential interference with the rights of HIV-positive persons to a dwelling of their choice. Therefore, the Court finds that Baxter is likely to succeed on the merits of his § 3617 claim.

### 6. *Baxter's Equal Protection Claim*

As stated earlier, there is a well-established judicial preference to avoid unnecessary constitutional rulings, *Singleton,* 428 U.S. at 124, 96 S.Ct. at 2877. Therefore, as the Court has determined that Baxter is entitled to injunctive relief on his statutory claims, it makes no determination as to the merits of his Equal Protection claim.

### C. REMAINING INJUNCTIVE RELIEF STANDARDS

### 1. NO ADEQUATE REMEDY AT LAW RESULTING IN IRREPARABLE INJURY

■ The Seventh Circuit has held that the traditional showing of irreparable harm is not required when the plaintiff seeks equitable relief to prevent the violation of a federal statute which specifically provides for injunctive relief. *See, Illinois Bell Telephone Co. v. Illinois Commerce Comm.,* 740 F.2d 566, 571 (7th Cir.1984), and cases cited therein. Under the FHA, injunctive relief is available pursuant to § 3613(c). That section provides:

> (1) In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

Therefore, because the Court has found that plaintiff is likely to succeed on the merits of his discriminatory housing claim under § 3604, the plaintiff need not show irreparable harm.

### 2. BALANCE OF HARMS

■ Baxter must also show that the threatened harm to him outweighs the harm the injunction may have on the City. As stated earlier, because Baxter has a strong likelihood of success on the merits, the balance of harms need not weigh heavily in his favor. *Roland,* 749 F.2d at 387.

The alleged harm to the City is based on the risk of transmission of the HIV infection if the residence were allowed to open. The Court finds that this perceived risk is insufficient to outweigh the harm to Baxter if he were to continue to be unable to open Our Place.

### 3. PUBLIC INTEREST

■ Baxter must finally show that if the injunction were to issue it would not harm the public interest. It has been noted that this determination is linked to the factor of the balancing of hardships. *Dolton,* 694 F.Supp. at 448. As the *Dolton* court stated, "public concern for safety is a legitimate factor to be considered by a court, but only if the concern is rationally based." *Id.* Here, the public concern for safety is based on the misperception that HIV-positive persons pose a risk of transmission to the public at large. As stated by the Supreme Court in *Arline,* "[t]he isolation of the chronically ill and of those perceived to be ill or contagious appears across cultures and centuries, as does the development of complex and often pernicious mythologies about the nature, cause, and transmission of illness." 480 U.S. at 284 n. 12, 107 S.Ct. at 1129 n. 12.

The Court finds that the public interest can best be served if discriminatory actions based on irrational fears, piecemeal information and "pernicious mythologies" are restrained.

### CONCLUSION

The Court, therefore, GRANTS Baxter's motion for a preliminary injunction as provided below. In so doing, the Court exercises its equitable powers to prevent the City from continuing a discriminatory practice that is based, almost exclusively, upon misapprehensions about the spread of the fatal HIV infection. The Court is cognizant of the strong public concern with the transmission of a fatal disease for which no cure exists. However, the fear of transmission into the general populace is unwarranted, particularly when that fear is based

on the belief that someone with HIV merely living in the same area poses a risk to the health and safety of the community. Irrational hysteria and public panic cannot support activity that violates the FHA and is clearly discriminatory. However, the Court is concerned that all interests be protected, and, therefore, GRANTS the motion for a preliminary injunction as follows:

1. The defendant, City of Belleville, is hereby preliminarily RESTRAINED and ENJOINED from refusing to issue to plaintiff, Charles Baxter, a special use permit for the residence at 301 South Illinois Street as a residence for HIV-infected persons.

2. The City of Belleville may establish reasonable restrictions as related to the issues of sanitation and non-admission of current illegal drug users as residents as conditions of said special use permit.

3. The City shall hold a hearing within ten (10) days of the date of this Order to establish the restrictions as provided in paragraph 2, and shall issue a special use permit within seven (7) days thereafter.

4. The Court deems security for costs unnecessary in this case because of the strong likelihood that plaintiff will succeed on the merits of his claim. Therefore, the security required by Fed.R.Civ.P. 65(c) is hereby WAIVED.

5. This preliminary injunction shall become a permanent injunction within sixty (60) days, absent the filing of an appeal or request for trial.

IT IS SO ORDERED.