**SUPPORT MINISTRIES FOR PERSONS WITH AIDS, INC., People of the State of New York by Robert Abrams, Attorney General of the State of New York, and Mary Jo Bane as Commissioner of the New York State Department of Social Services, Plaintiffs,**

v.

**VILLAGE OF WATERFORD, NEW YORK, Francis Falcone, Mayor, Anne Morrissey, Trustee, Merle Doud, Trustee, and Terry Coloney, Trustee, as the Village Board of the Village of Waterford, and Kenneth H. Smith, Mary Ann Kelts, William Coffey, and Marge Artt, as the Zoning Board of Appeals of the Village of Waterford, Defendants.**

Civ. No. 92–CV–539 RWS.

United States District Court,
N.D. New York.

Dec. 4, 1992.

**122**

De Graff, Foy, Holt–Harris & Mealey (James T. Potter, of counsel), Albany, NY, for plaintiff Support Ministries for Persons With AIDS, Inc.

Robert Abrams, Atty. Gen. of the State of N.Y. (Sanford M. Cohen, Donna I. Dennis, Robert R. Reed, of counsel), New York City, for plaintiffs Robert Abrams and Mary Jo Bane.

Donohue, Sabo, Varley & Armstrong, P.C. (Kenneth G. Varley, of counsel), Albany, NY, for defendants.

Kathleen M. Resnick, Albany, NY, for amicus curiae New York Civ. Liberties Union.

Isabelle M. Thabault, Harvey L. Handley III, Housing and Civ. Enforcement Section, Civ. Rights Div., Dept. of Justice, Washington, DC, for amicus curiae U.S.

### MEMORANDUM—DECISION AND ORDER

RALPH W. SMITH, Jr., United States Magistrate Judge.

Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 3601 et seq.[1] They seek declaratory, injunctive, and monetary relief to redress alleged arbitrary and unlawful discrimination by defendants on the basis of handicap as defendants have refused to allow plaintiff Support Ministries for Persons With AIDS, Inc. (hereinafter "Support Ministries"), to open a residence for homeless persons with AIDS (hereinafter "PWAs")[2] and thus have allegedly violated the rights of handicapped persons under the Federal Fair Housing Act (hereinafter "FHA"), 42 U.S.C. § 3601 et seq., and the Fourteenth Amendment.

This matter was referred to the undersigned on June 23, 1992, by the Honorable Frederick J. Scullin, Jr., United States District Judge, for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and upon consent of the parties.

This court previously found that the state plaintiffs have standing to sue due to the State's proprietary interest in reducing or maintaining the costs of providing care to PWAs and its quasi-sovereign interest in protecting the health and welfare of its citizens. *Support Ministries for Persons With Aids, Inc. v. Village of Waterford,* 799 F.Supp. 272 (N.D.N.Y.1992).

A bench trial was held before this court on October 26 through 29, 1992. After very careful consideration of the trial transcript, the evidence produced at trial, the pre- and post-trial submissions of the parties, and the amicus curiae briefs submitted by the New York Civil Liberties Union and the United States, this court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

Support Ministries is a New York nonprofit corporation with a Board of Directors comprised of representatives from numerous religious denominations throughout the Capital District region and concerned individuals in the community. This plaintiff currently operates a residence for homeless PWAs in the City of Albany and has submitted an application to the Department of Social Services (hereinafter "DSS") for an operating certificate to establish and operate an adult care facility for homeless PWAs at 31 Sixth Street, Waterford, New York (hereinafter the "Sixth Street house").

According to a Program Document issued by Support Ministries, their mission

> is to minister to HIV infected people who lack the physical ability to live independently, or the financial and support re-

---

1. On July 28, 1992, this court dismissed plaintiffs' state claims brought pursuant to sections 296(5)(a)(2) and 296(6) of the New York Executive (Human Rights) Law, section 40–c of the New York Civil Rights Law, section 7–712 of the New York Village Law, and Article 78 of the New York Civil Practice Law and Rules. *Support Ministries for Persons with AIDS, Inc. v.*

*Village of Waterford,* 799 F.Supp. 272 (N.D.N.Y. 1992).

2. For purposes of this decision, the term "PWAs" includes all persons who test positive for the human immunodeficiency virus ("HIV"), which causes Acquired Immune Deficiency Syndrome ("AIDS").

sources to secure living arrangements conducive to their well-being. This entails moving people out of shelters, hotels/motels or off the street, where isolation and inconsistent care can hasten their demise. The immediate need is for a safe and secure residence for PWAs, a place where they can work toward greater independence. Therefore, the residence will provide services consistent with this goal. Residents are expected to [be] independent in all normal activities of daily living.

The Sixth Street house would not be a medical facility, and Support Ministries would not be providing medical care to the residents.

In late spring or early summer 1990, after an extensive search, Support Ministries located the Sixth Street house, which was constructed in 1880 as a residence for Roman Catholic priests and was later occupied commencing in 1953 by the Sisters of Mercy. Around 1960 an addition was put onto the building which created a total of fifteen bedrooms. The property was purchased in 1984 by the Holy Cross Fathers and was utilized not as a convent but as a novitiate for the training of incoming novices. From that time until 1990 as many as fifteen people were housed in the building at a given time.

The Sixth Street house is virtually perfectly suited for Support Ministries' purpose to operate an adult home for as many as fifteen PWAs. The building contains fifteen separate bedrooms and several community living areas. In addition, it is located near the geographic center of the Capital District. Limited alterations would be necessary, such as the addition of an elevator, a ramp, and a couple of bathrooms.

Support Ministries entered into negotiations with the Holy Cross Novitiate, Inc., in July 1990 to purchase the property. Support Ministries did not hide its intentions with respect to that property from the community. Rather, in the fall of 1990 Support Ministries commendably contacted Village Mayor Francis Falcone and other members of the community and began holding a series of informational meetings.

On September 25, 1990, at the request of church and community leaders, Support Ministries held a public informational meeting at the United Church in Waterford to explain its proposed use of the building. Mayor Falcone attended along with several residents who expressed strong "moral opposition" to PWAs and the establishment of a residence in the village for PWAs. Support Ministries' Executive Director Nancie Northrup Williams testified that these residents had very bad information about the project and "spent a great deal of time talking about the fact that HIV and AIDS was an illness that people brought on themselves and it was a punishment from God and we had no obligation to respond compassionately to these people."

At the request of Mayor Falcone, Support Ministries held another public informational meeting at the Waterford Rescue Squad building on September 26, 1990 (hereinafter "the rescue squad meeting"). This meeting was attended by the members of the Waterford Board of Trustees (hereinafter "the board"), several members of the Zoning Board of Appeals (hereinafter the "ZBA"), most of the members of the Support Ministries Board of Directors, and between 200 and 250 other people. Support Ministries asked Dr. Stephen Szebenyi, the Medical Director of the AIDS Treatment Center at Albany Medical Center, to make a presentation. Likewise, they asked Margaret Irwin, Executive Director of Joseph House, a homeless shelter, to talk about homelessness and the impact of AIDS on homelessness in the communities. Finally, Support Ministries asked a member of the League of Women Voters to act as the facilitator of the meeting.

At the rescue squad meeting numerous citizens strongly expressed their opposition to the opening of a facility for PWAs in Waterford. Their objections included the fact that the property is located close to a school and a playground as well as fear of AIDS and drugs. Opposition was so strong that the audience grew extremely hostile, so much so that the "heckled" League of Women Voters moderator left, and Mayor Falcone took over the meeting.

(At a subsequent board meeting Falcone expressed his pleasure that the woman from the League did not last too long.). At one point, even before there was a complete presentation of the proposed project, he asked everyone who opposed the project to stand. About eighty-five percent of the audience did so.

At approximately the same time as the informational meetings were being held, some village residents began circulating a petition that was captioned: "We, the undersigned residents of Waterford, hereby petition the village zoning board to DENY the varience [sic] requested by the Support Ministries For Persons With Aids, Inc. to change the zoning at 31 Sixth Street. The purpose requested is to accomodate [sic] a shelter for the homless [sic] people infected with aids." (hereinafter "the Petition"). Over 400 village residents signed the Petition, which represented more than half of the village voters in 1991. Among the signatories were Millie Van Buskirk and George Bush. Although neither was a village official at the time the Petition was signed, George Bush was later appointed on November 14, 1990, as Zoning Commissioner, upon nomination by Falcone, and Millie Van Buskirk was appointed to the ZBA, also at the suggestion of Falcone, in September 1991. Several pages of the Petition stated that they should be returned to Ben Kelts, who is the husband of defendant ZBA member Mary Ann Kelts. Family members of other board members also signed the Petition.

On October 10, 1990, the board, which consisted of Mayor Falcone and Trustees Terry Stoliker, Merle Doud, Timothy Breen, and Ernie Bariteau, Jr., conducted its regularly scheduled monthly meeting. During the course of the meeting village residents presented the Petition to the board. Mayor Falcone indicated that he would turn it over to the ZBA.

Also during this meeting one of the village residents asked what stand the board was taking with respect to Support Ministries' proposal to open a home for PWAs. All of the board members indicated that they opposed the opening of such a facility in Waterford. One board member, Terry Stoliker, asked how many signatures were on the Petition. After being told by Falcone that 430 names had been collected in one week, Stoliker stated, "It seems to me that with over 400 people voicing their opinion against this, we were elected to represent them, I think that's pretty much an indication of how they feel and knowing that, then I'm not in favor of *this AIDS building* coming to Waterford." (emphasis added). Another board member, Merle Doud, stated,

> I don't like the idea of *an AIDS building* in our community. On the other hand, we do have a moral obligation in some sense to people who are homeless and why this building was picked, it would be nice if it wasn't in our community. We wouldn't have to worry about it. I do feel that with a petition of 400 people with names on it, that you would have to take that into consideration.... There is definitely a need for this type of thing, but whether it should be in our community or not, the building becomes available with 15 small rooms, with a dining room and living room in the building which apparently is the sort of thing that they are looking for. It's a tough question morally, if you think about it. Again, as I said, you've got 400 signatures of our electorate, that does make a difference."

(emphasis added). Mayor Falcone also voiced his opposition, stating, "My personal feelings [sic] is I do not want it in the Village of Waterford. That's all I'm going to say."

A discussion of how the zoning laws could be changed to prevent Support Ministries from using the Sixth Street house also took place during the meeting. One member of the audience suggested a density law directed solely at the Sixth Street house. Another resident stated, "Why don't you just work on the grouper law and just put another block that [they'll] have to move. This will be another lag, you know, force enough time, maybe they'll just give up.... another stop gap." Another member of the audience told the board, "So, some activity should take place now if you're looking at preventing it based on

what [the] population in this community wants right now. You still have to make the decision." Mayor Falcone responded, "When we get finished with this meeting, the Board, myself and Mr. Varley will sit down and we will see what our options are." Someone from the audience later asked, "How can the citizens persuade you to initiate this process?" Mayor Falcone answered, "I really don't feel that you're going to have to persuade."

At this same meeting the board convened an executive session. Although the board did not declare its purpose for this session as required by the Open Meetings Law, N.Y. Public Officers Law § 105(1) (McKinney 1988), it is clear that it was to devise a change to the village's zoning laws that would prevent Support Ministries from opening a residence for PWAs in Waterford. During this executive session, the Village Attorney acknowledged that if Support Ministries applied for a special use permit to use the property as a rooming and boarding house, "you pretty much have to give it to them." As a result, the board discussed amending the definition of "boarding and rooming houses" in the village's zoning ordinance. In considering possible amendments to the zoning law, the Village Attorney stated:

> ... *You might get away with say, coming up with some definition which would seem to apply to this, to make sure it would apply to this particular use.* You could argue that you already exclude nursing and convalescent homes. If you wanted to beef up that definition to a slightly different definition ... because it already excludes nursing and convalescent homes in a residential district. That would involve doing something with the definition of boarding house to make sure that includes people suffering from or recuperating from illnesses that require medical attention *to make sure that when it comes to deciding what types of facility this is, it's something that doesn't fall into the boarding house.*

(emphasis added). As a result of this session, Local Law No. 2 of 1990 was drafted.

On November 14, 1990, before Support Ministries completed its purchase of the property, the board had its next meeting at which Mayor Falcone introduced Local Law No. 2 of 1990, which amended the definition of the term "boarding house" contained in the village's zoning ordinance to read as follows:

BOARDING HOUSE AND ROOMING HOUSE: A private dwelling in which at least four but not more than six sleeping rooms are offered for rent and board may be furnished to roomers, and in which no transients are accommodated. A boarding or rooming house shall not include a nursing home, convalescent home, hospice, or other building which is primarily intended to provide accommodation for persons suffering from or recovering from or recuperating from any illness or disease or whose occupants regularly receive any medical or nursing care or treatment.

(Local Law No. 2 of 1990).

Since September 7, 1965, rooming and boarding houses had been listed as special permitted uses in residence districts. The term "boarding house" was defined as "a private dwelling in which at least four but not more than ten sleeping rooms are offered for rent and table board may be furnished to roomers, and in which no transients are accommodated." Prior to the announcement of Support Ministries' intention to open an adult home for PWAs, no citizen of Waterford had ever expressed a need to amend this definition, including the number of rooms that may be furnished.

On November 28, 1990, over 200 village residents attended a public hearing to consider the adoption of Local Law No. 2 of 1990. Most of them expressed opposition to the Support Ministries' facility, and many expressed their fears about AIDS. As board member Doud stated at his deposition, they were against the building being used as an AIDS house. At the conclusion of the meeting, the board unanimously adopted Local Law No. 2 of 1990.

After that meeting, Mayor Falcone explained to the media his reasons for adopting Local Law No. 2 of 1990. He stated,

"My biggest fear is these people are drug abusers, alcohol people. They come out of rehabilitation centers. They're homeless people." He also stated, "These are drug abusers, alcohol people, homeless people that they want to bring to a village of 2,500 people a half a block from a school. A block from two playgrounds. No, I really don't want to see them in my village."

Nancie Northrup Williams was not invited to attend the board meetings on October 10, November 14, or November 28, nor was she apprised by any village official that Support Ministries would be discussed at those meetings.

Prior to its purchase of the Sixth Street house, Support Ministries applied to the New York State Homeless Housing and Assistance Corporation, which is administered by DSS, for funding assistance for the Waterford project. DSS made a conditional reservation of funds under the Homeless Housing and Assistance Program to establish the proposed facility and notified Support Ministries on January 7, 1991, of the conditional award of $530,000 to be used toward the cost of acquisition and rehabilitation. Support Ministries, however, could not access this money because in the wake of Local Law No. 2 of 1990, the issue of zoning approval remained unresolved. As a result, when they purchased the Sixth Street house on May 29, 1991, for $165,000, they were required to finance the purchase with mortgage loans and other unsecured loans, which must be repaid and are currently bearing interest. Up to the time of trial they incurred interest costs in the amount of $16,473.24, and they continue to incur monthly interest costs of approximately $900.

In April 1991 the New York State Office of Parks, Recreation and Historic Preservation determined that the project would have no adverse impact upon 31 Sixth Street. On November 6, 1991, the New York State Homeless Housing Assistance Corporation determined that the proposed use of the facility would have no significant adverse environmental impact.

In early October 1991, Steve Brown, the village Building Inspector, refused Support Ministries' request for a certificate of occupancy (hereinafter "CO"), stating that zoning approvals would be needed before the building could be occupied.

As a result of the passage of Local Law No. 2 of 1990, and due to the relationship between the village and Support Ministries, Support Ministries retained counsel to work with the ZBA. Nancie Northrup Williams had previously done a number of zoning applications and felt qualified to handle the process in this case had Support Ministries not encountered problems with the village.

On October 31, 1991, Support Ministries applied to the ZBA seeking two alternative forms of administrative relief. First, they sought a determination that the proposed use constituted a continuation of a pre-existing non-conforming use. Second, they sought a special use permit for a boarding house as defined prior to its recent amendment. Significantly, Support Ministries "respectfully submitted that Local Law No. 2 of 1990, which purports to limit the long-standing definition of a 'Boarding House,' is violative of the Fair Housing Act and therefore is null and void as it applies to this project." In connection with this second application, Support Ministries sought a variance from the former definition of boarding house and rooming house to permit the use of the premises for the housing of up to fifteen unrelated persons. They also sought a variance from the requirement of one parking space for each facility resident, asking that they be allowed to operate with just four parking spaces because it is anticipated that few, if any, of the project residents will have cars and a need for parking. It was also noted that the Novitiate operated with only one parking space.

The ZBA referred the matter to the Saratoga County Planning Board, which on December 19, 1991, voted to return the matter for local consideration, finding that there would be no adverse county-wide impact.

Public hearings on Support Ministries' application were held by the ZBA over a three-month period, on January 9, February 13, and March 12, 1992. The uncontra-

dicted evidence before the ZBA established that a home for PWAs does not constitute a threat to the health or safety of the community. Residents of the building would be carefully screened to determine their suitability for the residence. This screening would be conducted by a three-member panel consisting of the executive director, a clinical social worker, and a licensed psychologist. The facility would be drug and alcohol free, with as-needed testing, and the residents would be required to sign a contract stating that they would honor this policy. Any violations would be grounds for immediate eviction. Violators would be treated as emergency cases by DSS, and immediate alternate housing would be found.

Evidence was also introduced concerning the staffing of the facility and the manner in which it would operate. Among other things, Support Ministries disclosed that upon zoning approval, it would be seeking to operate the facility as an adult care facility subject to DSS regulations. Testimony also disclosed that Support Ministries would not provide medical care or operate the house as a medical facility and that very few residents, if any, would have cars.

During the course of the hearings, two members of the board, Terry Stoliker and Ernie Bariteau, appeared before the ZBA seeking to persuade them to deny the application. In addition, Mayor Falcone presented the Petition to the ZBA. In the five years the current ZBA Chairman has been on the ZBA, a board member had never addressed the ZBA on a specific matter.

In March 1992, while Support Ministries' application was pending before the ZBA, Mayor Falcone proposed holding a referendum in which the village residents would be asked whether they favored or opposed the establishment of an adult care facility for PWAs at the Sixth Street house. In his 27 years as a Waterford resident, there had never been a referendum on zoning board matters such as the one he proposed.

On March 26, 1992, the ZBA met and unanimously denied Support Ministries' application in its entirety. Ken Smith, ZBA Chairman, based his vote on the requirements of Local Law No. 2 of 1990, on the status of the intended residents of the project as former users of drugs or alcohol, and on the community opposition to the project, including the Petition. William Coffey based his negative vote on the requirements of Local Law No. 2 of 1990 and the fact that the majority of the Waterford residents were opposed to the project, which he understood to be based on the fact that it was to be used as a home for PWAs. Mary Ann Kelts based her opposition vote on the requirements of Local Law No. 2 of 1990, which do not permit the proposed project to qualify as a boarding house.

Prior to taking the vote, Kelts read a letter from defendant Marge Artt, a ZBA member who was not present that evening and therefore did not cast a vote. As read at the hearing, Artt stated in her letter:

> As a member of the [ZBA] I feel that along with the other members we have been put in a very difficult position. Our 'job' was to consider a variance for the building located at 31 Sixth Street, also a variance on the parking. *That building is now known as the AIDS House and it appears that our vote or my vote is to be contingent on the AIDS issue.*

> In my opinion the variances on the property have become secondary to what the Support Ministries for Persons with AIDS, Inc. want to use the building. Perhaps because of ignorance (of which the people of the Village have been accused) they, the Villagers, are divided in their opinions.

> I feel that I can look at this objectively, but too many people are involved that don't have the Village at heart. Persons with a contagious disease are being placed in the middle of a residential area. I know they are not going to try to infect those in the Village but among many of the Villagers there is fear—for themselves, their children and their relatives because the inhabitants of 31 Sixth Street will have the run of the Village, parks, swimming pool, etc. They cannot be prohibited from any of these facilities.

Even religion has entered into this issue. We have had quotes from the Bible, the Gospels, etc. to impress upon us, the Board, that we should show compassion for those who are afflicted with this disease. I have compassion for them and also for those who are concerned.

Somehow I and everyone concerned must get back to the original issues. It is too bad that the people of Waterford have had to be a part of a test case. It is very unfair.

(emphasis added).

The ZBA found that the proposed use by Support Ministries did not constitute a continuation of a prior non-conforming use because the use of the building as a convent at the time of original enactment of the zoning ordinance was conforming.[3] They also determined that in any event the non-use of the building for more than a year would have extinguished any right to a non-conforming use of the property. Support Ministries' application for a special permit was also denied since the ZBA found that the proposed use of the building did not fall within the new definition of a boarding house contained in Local Law No. 2 of 1990. The ZBA issued a written opinion which stated in part:

> The applicant intends to use the facility solely to provide housing for persons who have been diagnosed or are awaiting diagnosis of HIV infection. This clearly is the type of use which is not considered to qualify under the definition of 'boarding house.' The applicant has asked this board to, in effect, disregard the amendment to the zoning law which has defined the phrase 'boarding house.' However, this board must apply the law as written. While this board is empowered to grant variances if it [sic] not permitted to ignore the plain meaning of the zoning ordinance.

The ZBA also refused to decide Support Ministries' request for variances from the bedroom limitation in the definition of a boarding house and the parking space requirements of the zoning law.

Nancie Northrup Williams was told by Mayor Falcone that he had received a number of threats that the building would be burned down. These purported threats were reported by the media. In addition, Falcone told her that "the project would never work in that location, that he just couldn't see it ever happening, that the village would never allow it."

Transmission of HIV can occur only through the exchange of body fluids during intimate sexual contact with an infected person, perinatal exposure (from mother to infant), or the transfer of infected blood products. HIV is not transmitted by casual contact such as sharing eating utensils, bathrooms, or a swimming pool. Numerous studies of persons living in the same household as PWAs have found not a single instance of HIV transmission through household contact. In addition, HIV is not transmitted through mosquitoes. The presence of a group home for PWAs would not pose any significant threat to the health or safety of the members of the community in which it was located as there is no way by which HIV can be transmitted simply from PWAs living in the neighborhood.

Furthermore, the presence of PWAs in the Sixth Street house would not pose a significant risk of spreading tuberculosis (hereinafter "TB") to the community. People with active TB would be excluded from the home, all of the residents would undergo periodic TB screenings to ensure that they do not have active TB, and anyone diagnosed as having active TB would be on a full pharmacological regime to keep it from becoming contagious. Since the residents will be afflicted with compromised immune systems, the facility would be very diligent in preventing introduction of any infection that would pose a threat to the community at large.

3. As correctly noted by plaintiffs in their post-trial brief, however, in 1979 the property was taken over by the Holy Cross Brothers and was used as a residence for up to fifteen unrelated men throughout the 1980s. They obviously did not use the property as a convent, but their non-conforming use remained undisturbed by the village.

## II. DISCUSSION AND CONCLUSIONS OF LAW

The 1988 Amendments to the FHA, which became effective March 12, 1989, expanded the FHA to prohibit discrimination in housing based upon handicap and to allow private litigants the right to challenge allegedly discriminatory housing practices. Section 3604(f)(1) makes it unlawful:

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1). Further, section 3617 provides:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section ... 3604 ... of this title.

42 U.S.C. § 3617.

### A. The Proposed Residents of the Sixth Street House ARE "Handicapped" Within the Meaning of the FHA.

■ The threshold issue is whether the proposed residents of the Sixth Street house are "handicapped" within the meaning of the FHA. Defendants incredibly would have this court believe that such persons are not handicapped. They contend that since the clear purpose of the Sixth Street house is to provide group housing to persons who are able to care for themselves, this facility does not qualify as a residence for the "handicapped." They note the Support Ministries' program document which states that persons in residence at the Sixth Street house must be independent in all activities of daily living (hereinafter "ADL") and that the inability to care for oneself is a ground for discharge from the facility. Defendants also point out testimony given at the ZBA public hearings by Nancie Northrup Williams that it is expected that the residents will be ambulatory when they arrive, that they will not be accepting individuals who need assistance with ADL, and that the residents will be independent and functioning. (Exhibit P–35 at 30–31).

Defendants assert that this court should not allow Support Ministries to classify the proposed residents as independent and fully functional for one reason, i.e., to qualify as a non-medical "boarding house," yet on the other hand describe the residents as less than fully functional to qualify for the designation of "handicapped" under the FHA. They contend that a determination by this court that HIV-infected persons who are able to care for themselves are in fact "handicapped" under the FHA would be an unprecedented ruling which is not mandated by the unambiguous language of the statute. This court disagrees with defendants' arguments.

The legislative history of the 1988 amendments to the FHA reveals that Congress intended to include among "handicapped" persons those who are HIV-positive:

Coverage of Handicapped Persons

H.R. 1158 includes handicapped persons as a protected class. Handicapped persons have been protected from some forms of discrimination since Congress enacted the Rehabilitation Act of 1973, and the bill uses the same definitions and concepts from that well-established law. In the 1980 Fair Housing bill, Congress also included protections for individuals with handicaps.

Prohibiting discrimination against individuals with handicaps is a major step in changing the stereotypes that have served to exclude them from American life. These persons have been denied housing because of misperceptions, ignorance, and outright prejudice.

1988 U.S.Code Cong. & Admin.News 2173 at 2178.

The Fair Housing Amendments [sic] Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream. It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

. . . .

People with Acquired Immune Deficiency Syndrome (AIDS) and *people who test positive for the AIDS virus* have been evicted because of an erroneous belief that they pose a health risk to others.

All of these groups have experienced discrimination because of prejudice and aversion—because they make non-handicapped people uncomfortable. H.R. 1158 clearly prohibits the use of stereotypes and prejudice to deny critically needed housing to handicapped persons. The right to be free from housing discrimination is essential to the goal of independent living.

*Id.* at 2179 (emphasis added). Furthermore, as pointed out by plaintiffs in a post-trial submission, the House soundly defeated a proposed amendment to the FHA which would have excluded infection with the HIV virus as a handicap as that term was defined in the 1988 amendments. 134 Cong.Rec. 16509–10 (1988).

The legislative history of the recently enacted Americans with Disabilities Act (hereinafter "ADA") is also enlightening. It specifically mentions that infection with HIV is included in the ADA's definition of "disability,"[4] which is virtually identical to the definition of "handicap" contained in the FHA and the Rehabilitation Act. H. Perritt, *Americans With Disabilities Act Handbook*, 24 (1990).

Defendants nevertheless contend that the legislative history of the FHA is irrelevant because its definition of a "handicap" is unambiguous. *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 n. 3, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989) (citing *United States Airlines, Inc. v. McMann*, 434 U.S. 192, 199, 98 S.Ct. 444, 448, 54 L.Ed.2d 402 (1977)). It is clear, however, that the statute does not define the term "a physical or mental impairment which substantially limits one or more of such person's major life activities." Nevertheless, even without considering the legislative history, this court would still find that the proposed residents of the Sixth Street house are "handicapped" within the meaning of the FHA.

Section 3602(h) defines "handicap" as follows:

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance as defined in section 802 of Title 21.

42 U.S.C. § 3602(h). This definition parrots the definition of "handicap" contained in the Rehabilitation Act of 1973, *see* 29 U.S.C. § 706(8)(B), which is not surprising since the 1988 amendments to the FHA were modeled after the Rehabilitation Act. *Baxter v. City of Belleville, Ill.*, 720 F.Supp. 720, 729 (S.D.Ill.1989).

---

**4.** Section 3(2) of the ADA defines "disability" with respect to an individual as:
    A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
    B) a record of such impairment; or
    C) being regarded as having such an impairment.

"The ADA uses the term 'disability' instead of 'handicap' because of Congress's impression that disabled interest groups prefer that terminology, but no change in concept is intended." H. Perritt, *Americans With Disabilities Act Handbook*, 25 (1990) (footnotes omitted).

Several courts have held that persons who are HIV-positive are "handicapped" within the meaning of the Rehabilitation Act. *Doe v. District of Columbia,* 796 F.Supp. 559, 568 (D.D.C.1992); *Glanz v. Vernick,* 756 F.Supp. 632, 635 (D.Mass. 1991) (defendants did not dispute that HIV-positive status is a "handicap"); *Casey v. Lewis,* 773 F.Supp. 1365, 1370 (D.Ariz. 1991); *Thomas v. Atascadero Unified Sch. Dist.,* 662 F.Supp. 376, 379–81 (C.D.Cal. 1987).

In addition, several courts have found that PWAs are legally "handicapped," both under the FHA and the Rehabilitation Act. *E.g., Chalk v. United States Dist. Court,* 840 F.2d 701 (9th Cir.1988) (Rehabilitation Act); *Martinez v. School Bd. of Hillsborough County, Fla.,* 861 F.2d 1502, 1506 (11th Cir.1988) (Rehabilitation Act); *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of the Town of Fairfield,* 790 F.Supp. 1197, 1202 (D.Conn. 1992) (The parties stipulated that all HIV-infected persons are handicapped within the meaning of the FHA.); *Association of Relatives and Friends of AIDS Patients v. Regulations & Permits Admin.,* 740 F.Supp. 95, 103 (D.P.R.1990) (persons terminally ill with AIDS are handicapped within the meaning of the FHA); *Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 729–30 (S.D.Ill.1989) (persons who are HIV-positive are handicapped under the FHA); *Doe v. Attorney General,* 723 F.Supp. 452, 454 (N.D.Cal.1989) (Rehabilitation Act), *modified on other grounds,* 941 F.2d 780 (9th Cir.1991). In addition, one court has reported that "two-thirds of the states have announced either administratively or judicially that AIDS-related discrimination is illegal under their statutes." *Cain v. Hyatt,* 734 F.Supp. 671, 678 (E.D.Pa.1990) (citations omitted).

Furthermore, it was noted in one case that the Department of Health and Human Services has taken the position that HIV positivity is a handicap for purposes of the Rehabilitation Act. *Doe v. District of Columbia,* 796 F.Supp. at 567 n. 10 (citing *In re Westchester County Medical Ctr.,* 2 Emp.Prac.Guide (CCH) 5340 at ¶ 6999–323 to 324 (Apr. 20, 1992) (decision of the ALJ

terminating federal financial assistance to the medical center based on unlawful discrimination against HIV-positive pharmacist)). That same court also noted that the Reagan Administration took the same position, *Id.* (citing Memorandum from Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, to Arthur B. Culvahouse, Counsel to the President, FEP Manual (BNA) No. 641, at 405:6–7 (Sept. 27, 1988)), and yet another court has noted that the Department of Justice has done likewise. *Leckelt v. Board of Comm'rs of Hosp. Dist. No. 1,* 714 F.Supp. 1377, 1385–86 n. 4 (E.D.La.1989) (citing Department of Justice, Office of Legal Counsel, "Application of Section 504 of the Rehabilitation Act to HIV-infected Individuals," Sept. 27, 1988), *aff'd,* 909 F.2d 820 (5th Cir.1990)).

Prior to the above-cited cases, the United States Supreme Court declined to determine whether a person who is simply a carrier of a disease, such as some carriers of the AIDS virus, is handicapped under the Rehabilitation Act because the case before the court did not present that issue. *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 282 n. 7, 107 S.Ct. 1123, 1128 n. 7, 94 L.Ed.2d 307 (1987) (plaintiff was not HIV-positive but was a tuberculosis victim), *reh'g denied,* 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987). The Court did, however, hold that persons with contagious diseases may be handicapped for purposes of that Act. *Id.* at 280–86, 107 S.Ct. at 1127–30. The Court stated, "[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness.... The isolation of the chronically ill and of those perceived to be ill or contagious appears across cultures and centuries, as does the development of complex and often pernicious mythologies about the nature, cause, and transmission of illness." *Id.* at 284 & n. 12, 107 S.Ct. at 1129 & n. 12.

Moreover, the descriptions of the physical and mental condition of the proposed residents of the Sixth Street house support a finding that they are "handicapped." Defendants correctly note that the proposed residents are to be independent in ADL,

which encompasses an individual's ability in terms of personal hygiene, bathing, and feeding. (Trial Transcript hereinafter "Tr." at 78). Nevertheless, defendants conveniently ignore additional trial testimony that most of the residents will be suffering from chronic fatigue and weakness, which this court finds would limit one's ability to engage in major life activities. (See Tr. at 11, 90–91). As Nancie Northrup Williams stated at her deposition, which was read into evidence, these individuals would not necessarily be capable of living in a private facility on their own if they could afford the facility

> [b]ecause [of] the nature of HIV infection, although someone may be able to get up in the morning and shower and brush their teeth and take their medication, [it] does not necessarily mean that they also have the strength to be able to clean the apartment or walk down three flights of stairs to go to the grocery store or prepare three meals a day independently. One of the most notable indications of HIV infections is a high level of tiredness, chronic fatigue and chronic diarrhea, which often makes people very weak and unable to motivate themselves and take care of themselves, even though physically they may be able to. There is a question of motivation, that they are either fatigued or ill, so that we would provide those services for them in that event.

(Tr. at 313–14). Ms. Northrup Williams also testified that for some residents their "medication will result in further decompensation in their ADL abilities" and that some residents will arrive at the facility moderately weak from hospitalization. (Tr. at 90–91). Obviously, given the episodic nature of the disease, their status will vary. Such fluctuations, however, should not prevent these residents from being legally classified as handicapped.

Even if the proposed residents were not so physically fatigued and weak, this court would nevertheless find them to be "handicapped" for purposes of the FHA. This court agrees with the District Court in the Eastern District of Pennsylvania that "even if it were asymptomatic, the … HIV infection constitutes a substantial physical limitation upon major life activities." *Cain v. Hyatt,* 734 F.Supp. at 679 (interpreting a Pennsylvania statute with the same definition of "handicap"). That court noted that

> since first identified in the early 1980s as a distinct medical condition, AIDS has engendered such prejudice and apprehension that its diagnosis typically signifies a social death as concrete as the physical one which follows.... [T]o conclude that [PWAs] are stigmatized is an understatement; they are widely stereotyped as indelibly miasmic, untouchable, physically and morally polluted. *These and related prejudices substantially curtail the major life activities of AIDS victims.* They are shunned socially and often excluded from public life.

*Id.* at 679–80 (emphasis added). Similarly, in a Rehabilitation Act case another District Judge found that a PWA's ability to interact with others is a major life activity. *Doe v. Dolton Elementary Sch. Dist. No. 148,* 694 F.Supp. 440, 444 (N.D.Ill.1988). Another District Judge in that same district similarly found that "the inability to reside in a group residence due to the public misapprehension that HIV-positive persons cannot interact with non-HIV-infected persons adversely affects a major life activity. The Court therefore finds that persons who are HIV-positive are handicapped within the meaning of the FHA." *Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 730. This court finds likewise.

Finally, while defendants assert that plaintiffs' position concerning the residents' condition is inconsistent, the same can be said about defendants' position. Defendants argue that the residents are not handicapped because of their ability to perform ADL, yet they contend that the Sixth Street house is not a boarding facility but should be characterized as a nursing or convalescent home. As Donna Dennis, the state plaintiffs' counsel, aptly asserted during her closing statement, "Defendants want it both ways, contending at the same time that the future residents of 31 Sixth Street are not handicapped because they are not sick enough to be in the hospital

and, on the other hand, 31 Sixth Street can't be a boarding house, so it must be a medical facility. I submit they are wrong on both counts. These people are not sick enough to be in the hospital, but do need assistance because of physical and mental impairment." (Tr. at 342).

B. Plaintiffs Have Established that Defendants Violated the FHA by Enacting and Enforcing Local Law No. 2 of 1990.

A violation of section 3604 of the FHA can be proven by showing either "discriminatory intent" or "disparate impact." *See, e.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 935 (2d Cir.) (racial discrimination), *review declined in part, judgment aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), *reh'g denied,* 488 U.S. 1023, 109 S.Ct. 824, 102 L.Ed.2d 813 (1989); *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1217 (2d Cir.1987) (racial discrimination), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *Stewart B. McKinney Found., Inc.,* 790 F.Supp. at 1210–19; *Association of Relatives and Friends of AIDS Patients,* 740 F.Supp. at 103; *Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 732. In the instant case, plaintiffs have established a violation of the FHA under both theories.

### 1. Discriminatory Intent

█ It is crystal clear that Local Law No. 2 of 1990 was enacted by the board members to prevent Support Ministries from establishing its adult home for homeless PWAs in Waterford. This conclusion is evident from, among other things, the text of the law, the timing of the amendment, the fact that an amendment to the definition of "boarding house" had never been proposed previously, and the transcript of the October 10, 1990, board meeting, including the executive session. As correctly noted by plaintiffs in their post-trial brief, during the executive session the following exchange took place:

Trustee Doud: What options do we have?

[Town Attorney]: There's a couple. One would be, you allow rooming and boarding houses in a residence district if there's a special permit used. If they apply for a special permit, you pretty much have to give it to them. You know, as long as they can show they need ... they can get all the parking spaces they need and so on. You would be hard pressed not to give it to them. Trustee Stoliker: That's what that looks like that would be, a rooming and boarding house.

[Town Attorney]: That would be their best bet.

.　　.　　.　　.　　.

One thing you could do is eliminate rooming and boarding houses from special permits in residential districts.

.　　.　　.　　.　　.

You might get away with say, coming up with some definition which would seem to apply to this, to make sure it would apply to this particular use. You could argue that you already exclude nursing and convalescent homes. If you wanted to beef up that definition to a slightly different definition ... because it already excludes nursing and convalescent homes in a residential district. That would involve doing something with the definition of boarding house to make sure that includes people suffering from or recuperating from illnesses that require medical attention to make sure that when it comes to deciding what types of facility this is, it's something that doesn't fall into the boarding house.

(Exhibit P–1 at 12–14).

In addition, this court also agrees with plaintiffs that a negative inference can be drawn from the fact that some of present and former members of the village board invoked the Fifth Amendment privilege against self-incrimination in response to questions concerning their actions in regard to the Support Ministries' proposal. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976). Mayor Falcone invoked this privilege at the conclusion of his trial testimony when he was asked to state whether he had

ever taken steps to prevent the opening of the Sixth Street house. (Tr. at 258). Trustee Doud and former Trustee Stoliker also invoked the privilege at their depositions. This court notes that at trial Stoliker testified that by voting for Local Law No. 2 of 1990 it was not his intent to make it more difficult for Support Ministries to utilize the facilities at 31 Sixth Street and that it was not his belief that that new law would apply to the Support Ministries facility. (Tr. at 140, 152, 155). This court, however, finds such testimony to be not credible.

This court further finds that the HIV-positive status of the future residents of the Sixth Street house was at least one factor, and probably the primary factor, for the enactment and application of the new zoning law.[5] Again, this conclusion is based in part upon the language of the new law and the transcripts of the October 10, 1990, board meeting, including the executive session. Furthermore, prior to the defendants' actions, there was a firestorm of opposition by the village residents against "the AIDS house/building," as it was frequently referred to by village residents and even some of the defendants. This opposition was clearly expressed at the various very well-attended public meetings, including by all of the board members at the October 10, 1990, meeting, and in the Petition signed by over 400 village residents.

Expressions of irrational fear of AIDS and misinformation about the disease were rampant. In addition, there were some blatant expressions of prejudice toward the "illegal or chosen lifestyles" "which may have helped to bring this illness about." (E.g., Exhibit P–49 at 24). "[T]his was an issue that rocked a comparatively small town." *Stewart B. McKinney Found., Inc.*, 790 F.Supp. at 1212. Trustee Doud stated that the residents were against the building being used as an "AIDS house" due to their fears. (Tr. at 180). Similarly, ZBA member Coffey stated that community opposition was based on the fact that the building was to be used as a home for PWAs. (Tr. at 217).

It is obvious that defendants "acted in furtherance of the misguided and discriminatory notions held by many [village] residents concerning AIDS patients or at least bowed to political pressure exerted by these ['AIDS house' opponents]." *Association of Relatives and Friends of AIDS Patients*, 740 F.Supp. at 104; *see Stewart B. McKinney Found., Inc.*, 790 F.Supp. at 1212. In fact, some of the defendants have actually admitted that public opposition played a role in their decisions.

Another factor considered by defendants was the fact that some of the proposed residents were formerly alcohol and/or illegal drug users. Mayor Falcone even appeared on local television stating, "My biggest fear is these people are drug abusers, alcohol people. They come out of rehabilitation centers. They're homeless people." He also stated, "These are drug abusers, alcohol people, homeless people that they want to bring to a village of 2,500 people a half a block from a school. A block from two playgrounds. No, I really don't want to see them in my village." (Exhibit P–21). Several courts have found that a record of drug or alcohol addiction constitutes a handicap. *E.g., United States v. Southern Management Corp.*, 955 F.2d 914 (4th Cir. 1992); *Oxford House–Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1342 (D.N.J. 1991). *See Teahan v. Metro–North Commuter R. Co.*, 951 F.2d 511, 517 (2d Cir. 1991) ("[I]t is clear that substance abuse is a 'handicap' for purposes of the Rehabilitation Act."), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992).

"[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process. A ... discriminatory act would be no less illegal simply because it enjoys broad public support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with

---

**5.** "The plaintiff's evidence of 'discriminatory intent, however, must demonstrate only that the HIV-infected status of the plaintiff's future [residents] was one factor, not the sole factor...." *Stewart B. McKinney Found., Inc.*, 790 F.Supp. at 1210–11.

discriminatory intent even if the decision-maker personally has no strong views on the matter." *Association of Relatives and Friends of AIDS Patients*, 740 F.Supp. at 104 (quoted by *Stewart B. McKinney Found., Inc.*, 790 F.Supp. at 1212). Here there is overwhelming evidence that defendants' actions were improperly motivated by the outpouring of public bias against PWAs and persons recovering from drug or alcohol addiction.

Even aside from the passage and application of Local Law No. 2 of 1990, there is further evidence that the defendants, particularly Mayor Falcone, coerced, intimidated, threatened, or interfered with Support Ministries' attempts to establish a residence for PWAs. For example, at the rescue squad meeting, even though the crowd was obviously extremely hostile toward the housing proposal, the mayor called for all those opposed to the project to stand. (Tr. at 248–49). This court agrees with plaintiffs that this was an action to dissuade Support Ministries from going forward, and it contributed to the threatening and coercive environment. In fact, trial testimony revealed that at the conclusion of the meeting the Support Ministries' representatives were escorted to the parking lot by the police. (Tr. at 39).

This court further agrees that it is significant that at the mayor's suggestion the board appointed to village offices people who were obviously opposed to the Support Ministries proposal. Prior to her appointment as a member of the ZBA, Millie Van Buskirk signed the Petition opposing the Sixth Street house. (Tr. at 242–43, 255). George Bush, who signed the Petition several times, was later appointed as Zoning Commissioner. (Tr. at 254–55).

Also significant is the mayor's unprecedented call for a public referendum on the proposed adult home just before the ZBA vote. In addition, he communicated to Support Ministries, and possibly to the media, that he had received anonymous threats that the Sixth Street house would be burned. (Tr. at 255–56, 51). Also, he told Nancie Northrup Williams that the project would never work in that location, that he just could not see it ever happening, and that the village would never allow it. (Tr. at 51).

Defendants assert that there was no intentional discrimination which was violative of the FHA because they did not consider the proposed residents of the facility to be handicapped. (Tr. at 162–63, 260, 308). Even if this court were to lend credence to their professed ignorance, defendants are not absolved of their liability as plaintiffs have also established a violation of the FHA under the disparate impact theory.

In any event, the ZBA members cannot plead ignorance to even the possibility that the proposed residents would be considered "handicapped" within the meaning of the FHA. At one of the three public hearings before the ZBA, a letter was read from attorney Kathleen M. Resnick, President of the Capital Region Chapter of the New York Civil Liberties Union, in which she advised the ZBA of a similar federal case, *Baxter v. City of Belleville, Ill.*, 720 F.Supp. 720 (S.D.Ill.1989), in which the court found that the city's actions violated the FHA due to intentional housing discrimination against PWAs based upon handicap. Attorney Resnick quoted the FHA, and she offered her assistance if there were any questions. In fact, she later personally appeared before the ZBA during that same hearing and again stated her availability to answer questions, but there is no record that any of the defendants accepted her offer.

Furthermore, Support Ministries' application to the ZBA respectfully submitted that Local Law No. 2 of 1990 violates the FHA and, therefore, is null and void as it applies to the Support Ministries project. The ZBA nevertheless bowed to public pressure and chose to apply that local law. They seem to assert that they had no authority to deviate from that new law, but I find no merit to that argument. This court agrees with plaintiffs that to the extent that the ZBA's decision applied and reflected a discriminatory law, its ultimate decisions were also tainted with discrimination, and they thereby violated the provisions of the FHA.

### 2. Disparate Impact

This court is also satisfied that plaintiffs have proven a violation of the FHA using a disparate impact analysis under which they

> need prove no more than that the conduct of the defendant[s] actually or predictably results in ... discrimination; in other words, that it has a discriminatory effect. The plaintiff need make no showing whatsoever that the action resulting in ... discrimination in housing was ... motivated [by a desire to discriminate against the handicapped.] Effect, and not motivation, is the touchstone.

*Stewart B. McKinney Found., Inc.,* 790 F.Supp. at 1216 (quoting *United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)). "This method of proving a violation of the [FHA] relieves the plaintiff of the onerous burden of proving discriminatory intent." *Id.*

The Seventh Circuit in *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978), established a four-pronged disparate impact test, which although raised in a racial discrimination case under the FHA, is equally applicable to the handicap amendments. *Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 732. These four factors are:

> (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis,* [426 U.S. 229 (1976) ]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Arlington Heights,* 558 F.2d at 1290.

This court finds that Local Law No. 2 of 1990 clearly has a disparate impact on people with handicaps. In fact, as plaintiffs correctly assert, that law's ban on the presence of "persons suffering from ... any illness or disease or ... regularly receive any medical or nursing care or treatment" has the effect of barring virtually all handicapped people from boarding or rooming houses in Waterford. Consequently, the passage of that law and its application by the ZBA had a disproportionate impact on people with handicaps in violation of the FHA. Furthermore, as discussed previously, there is clearly some evidence of discriminatory intent. Next, defendants have not established "that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d at 936. Defendants' actions were blatantly based on the community's unfounded fear of AIDS, their misperceptions of AIDS, and their prejudices against PWAs, and not on a legitimate zoning interest. Finally, in this case plaintiffs are not asking defendants to build public housing for PWAs but merely want to be allowed to use a house owned by Support Ministries as a residence for this handicapped group. Thus, this court finds that plaintiffs have proven a violation of the FHA by defendants under the disparate impact analysis set forth in *Arlington Heights,* 558 F.2d at 1290. *See Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 733.

### C. Occupancy of the Sixth Street House by PWAs Will NOT Constitute A Direct Threat To the Health and Safety of Other Individuals

Plaintiffs produced uncontested evidence concerning the very limited means of transmission of HIV. Dr. Bruce Agins, Associate Medical Director of the AIDS Institute, New York State Department of Health, testified at trial that HIV can be transmitted by only three methods. (Tr. at 117). It can be transmitted through blood when there is an exchange of blood from one person to another. The blood has to get into the other person's bloodstream in order to transmit the infection. (Tr. at 118).

In addition, HIV can be transmitted through sexual activity when there is a transfer of bodily fluids. (Tr. at 118). Finally, there can be a transfer of the infection from a mother to her unborn child, either when her blood is passed on to the child through the placenta or at the time of birth if there is damage to the blood vessels in the birth canal. (Tr. at 118).

Dr. Agins further testified that there have been several studies which have shown "that household contacts are not at risk of acquiring HIV provided they don't have a traditional risk factor themselves. That there is no transmission just from contact, or sharing household utensils, bathrooms. From routine household living you can't get HIV." (Tr. at 118–19). In addition, he stated that HIV cannot be transmitted through casual everyday contact outside of the household, through sharing a swimming pool, through mosquitoes, or just by having people living in the community. (Tr. at 119). Thus, he further testified that the presence of a group home for HIV-positive individuals would not pose *any* threat to the health or safety of the members of the community in which it was located. (Tr. at 119). Finally, on redirect examination Dr. Agins testified that if a facility excluded people with active TB, there would *not* be a significant risk of spreading that disease to the community. (Tr. at 132).

■ Despite this uncontradicted medical evidence, defendants now assert that Local Law No. 2 of 1990 should be upheld because, inter alia, the housing of fifteen HIV-positive persons at the Sixth Street house will result in a potential risk of infection of the village residents. They note that the FHA specifically provides that it is not required "that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals...." 42 U.S.C. § 3604(f)(9). Defendants contend that the "risk free" view of AIDS advocated by the plaintiffs is contradicted by the rapid spread of the disease, and they assert that "[i]t is ironic that plaintiffs deny the risks of AIDS transmission while at the same time point to the increasing number of AIDS cases as a rationale for their operation of this facility."

Defendants' argument merely repeats the uneducated, discriminatory beliefs that brought this case to this court. Their argument is totally unsupported by the medical evidence. *See Association of Relatives and Friends of AIDS Patients*, 740 F.Supp. at 103 (Defendant's denial of a special use permit to open an AIDS hospice cannot be justified on public health grounds); *Baxter v. City of Belleville, Ill.*, 720 F.Supp. at 726, 733 ("HIV-positive persons pose no risk of transmission to the community at large." The exclusions of section 3604(f)(9) do not support the defendant's denial of a special use permit for an AIDS hospice).

### D. Limitations on the Number of Persons Who May Occupy a Boarding House and Parking Requirements

■ Defendants note that the FHA allows reasonable restrictions on the number of persons that can occupy a dwelling. *See* 42 U.S.C. § 3607(b) ("Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling...."). Defendants contend that the new zoning law's limitation of no more than six sleeping rooms in a boarding house, reduced from ten in the previous law, is reasonable. Furthermore, they assert that nothing was developed at trial to suggest that the reduction from ten to six rooms was intended to prevent Support Ministries from using the facility, noting that Support Ministries has offered conflicting testimony regarding the number of residents necessary to make the facility economically viable.

While there never has been a definitive statement by Support Ministries concerning a financially viable occupancy rate, this court nevertheless finds that the amendment to the zoning law reducing the number of rooms was also intended by the board to be yet another roadblock to Support Ministries' project. This conclusion is based in part upon the trial testimony that

prior to the announcement of Support Ministries' intention to open the home, no citizen of Waterford had ever expressed a need to amend the boarding house definition contained in the village zoning ordinance. (E.g., Tr. at 188). Moreover, Trustee Doud testified at his deposition that no reports were prepared by the board regarding boarding and rooming houses. (Tr. at 188).

Furthermore, no one ever complained about the number of residents or the number of rooms during the thirty years the Sixth Street house was occupied by the Sisters of Mercy and the Holy Cross Fathers, whose use apparently was non-conforming but was never opposed by the community. Defendants assert that information regarding the number of people who occupied the facility while it was owned by the Holy Cross Fathers was not presented to the ZBA during the course of its hearing, and thus they can hardly be criticized for failing to consider information that they did not have. A review of the transcripts of the ZBA public hearings, however, shows that they were informed by Support Ministries that up to fifteen persons had previously occupied the building at one time. (Exhibit P–48 at 9, line 9; and at 18, line 8). This information was never questioned by the ZBA.

Defendants claim they are entitled to consider in these multiple occupancy situations the demands that will be placed on parking, traffic, garbage collection, etc. They note that there has been testimony that the parking and traffic situation in Waterford is already very difficult. (Tr. at 276–77). This argument, however, ignores the undisputed, credible testimony by Nancie Northrup Williams, both before this court and before the ZBA, that most of the proposed residents do not have cars (Tr. at 26, P–48 at 45) either due to medical reasons related to HIV or because of their necessity to meet the tests for needs-based service programs. (Tr. at 26). She stated that even people who may own a car do not have the money to register and insure it and keep it in good working order. (Tr. at 26). In addition, a car "often becomes an asset that is liquidated to enable them to finance housing and medical needs." (Tr. at 26).

Support Ministries proposes having a total of six parking spaces which would be adequate for their staff of two to four at a given time (Exhibit P–48 at 45) and a visiting nurse. (Tr. at 26). The deposition of one of the prior residents of the Sixth Street house reveals that up to five cars were driven by the residents, but all but one of the parking spaces were on the street. (Exhibit P–51 at 6). Support Ministries, on the other hand, plans to add four parking spaces on their property rather than parking on the street.

Furthermore, ZBA member William Coffey significantly stated at his deposition that his concerns about traffic congestion and parking in the area around the Sixth Street house did not play a role in his decision to deny Support Ministries' zoning application. (Tr. at 216). Trustee Doud similarly stated that parking did not play any part in his voting for Local Law No. 2 of 1990. (Tr. at 188).

Nancie Northrup Williams also testified about Support Ministries' arrangements for the disposal of infectious wastes. (Tr. at 27–28). Since the village would not be responsible for the removal of such waste, it would seem that the Support Ministries project would create no more demand for garbage collection than that which was demanded by the prior owners who also housed up to fifteen residents at a time.

In sum, this court finds that defendants' concerns about parking, traffic, and garbage are mere pretexts.

### E. Constitutional Issues

Plaintiffs assert that defendants' actions also violate the Fourteenth Amendment to the U.S. Constitution. However, since this court finds in favor of plaintiffs on statutory grounds, it is unnecessary to address their constitutional claim. There is a well-established "judicial preference to avoid unnecessary constitutional rulings." *Association of Relatives and Friends of AIDS Patients,* 740 F.Supp. at 107; *Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 734

(citing *Singleton v. Wulff,* 428 U.S. 106, 124, 96 S.Ct. 2868, 2879, 49 L.Ed.2d 826 (1976) (Powell, J., concurring in part and dissenting in part)).

## III. CAUTION TO THE OPPONENTS OF THE SIXTH STREET HOUSE

While this court is sensitive to the feelings of the citizens of the Village of Waterford and aware that there may be resentment by some that a court is imposing upon their preference to control their own affairs, ours is a nation of laws. These laws enacted by our elected representatives must be followed. Those afflicted by the HIV virus, however contracted, are entitled to understanding and compassionate treatment. Society has a moral and legal obligation to make reasonable accommodations to meet their needs and may not discriminate against them, particularly when such discrimination is based on misinformation or outright prejudice.

Given my findings and the relief ordered below, and in view of the almost violent opposition by some of the village residents, as well as alleged anonymous threats against the Sixth Street house, this court unfortunately finds it necessary to caution the project's opponents against any rash, irresponsible behavior against the facility, its staff, and its residents. Accordingly, as at least one other court has done in the past,[6] this court notes that among other possible state and federal criminal sanctions, 42 U.S.C. § 3631 provides for criminal sanctions against "[w]hoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with" handicapped persons exercising rights under the FHA. Upon conviction of a violation of section 3631, a defendant "shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life." 42 U.S.C. § 3631. This court trusts that these words of caution are unnecessary and that the village residents can at the very least peacefully coexist with the Sixth Street house residents.

## IV. RELIEF

### A. Injunctive Relief

"Mandatory injunctions are common in FHA and Rehabilitation Act cases.... Furthermore, § 3613(c) provides, in part, that the equitable relief available under the FHA includes 'an order enjoining the defendant from engaging in such practice *or ordering such affirmative action as may be appropriate.'*" *Baxter v. City of Belleville, Ill.,* 720 F.Supp. at 727 (emphasis added and citations omitted). Although this court does not sit as a "super zoning board," it is of the opinion that to send Support Ministries back before the ZBA may very well result in yet another denial of their application on grounds that are purely a pretext. In order to avoid even more unnecessary delay, it is the order of this court that the defendants are hereby permanently enjoined from interfering with Support Ministries' use of 31 Sixth Street as a residence for up to fifteen homeless PWAs and are directed to issue a Certificate of Occupancy for this use and expeditiously process any building permit applications submitted by Support Ministries.

### B. Monetary Damages

Section 3613(c)(1) provides that "if the court finds that a discriminatory housing practice has occurred ..., the court may award to the plaintiff actual and punitive damages...." 42 U.S.C. § 3613(c)(1).

#### 1. Interest Expense

■ As a result of Support Ministries' inability to access the grant under the Homeless Housing and Assistance Program, due to defendants' discriminatory actions, Support Ministries has been forced to incur monthly mortgage interest costs in the amount of $900. They seek an award of compensatory damages pursuant to 42 U.S.C. § 3613(c) for the interest expense

---

**6.** *Association of Relatives and Friends of AIDS* *Patients,* 740 F.Supp. at 108 n. 15.

incurred from the date they acquired the property, May 29, 1991, through and including the date of this court's order and judgment. This court finds, however, that Support Ministries is not entitled to recover the entire amount of interest sought.

There was an approximately five-month delay between the time Support Ministries closed on the Sixth Street property on May 29, 1991, and the time it sought a CO from the building inspector. Although there was a vague allegation that village officials delayed responding to Support Ministries' request for information concerning the proper procedure to apply for a CO (Tr. at 42–43, 315), I find that there is insufficient proof of any wrongdoing on the part of the Waterford officials in this regard to justify an award of damages in the amount of the mortgage and other loan interest payments during that five-month period.

■ Furthermore, it is clear that even under the prior zoning law Support Ministries would have had to seek a special permit by applying to the ZBA. They submitted their application to the ZBA on October 31, 1991. The ZBA referred the matter to the Saratoga County Planning Board, which on December 19, 1991, voted to return it to the ZBA. Allowing a reasonable amount of time for the ZBA to hold a public hearing on the application and 60 days to render a decision, *see* N.Y. Town Law § 267 (McKinney 1978), this court has determined that defendants shall be responsible for the reimbursement of Support Ministries' interest payments from March 1, 1992, through and including the date the CO is issued, at a rate of $900 per month, for a total so far through November 30, 1992, of $8,100.

Defendants assert that any interest awarded to Support Ministries should be diminished due to the fact that during trial the state voted to release $25,000 to Support Ministries to defray the cost of interest incurred to date, as well as certain architectural expenses. As correctly noted by plaintiffs, however, this grant will be subtracted from Support Ministries' ultimate grant award, so that they will later receive only $505,000. In view of this fact,

this court will not reduce the amount of interest awarded to Support Ministries.

### 2. Attorney's Fees For Zoning Process

■ As a result of defendants' improper conduct, Support Ministries was required to retain counsel, the law firm of DeGraff, Foy, Holt–Harris & Mealey, to attempt to secure zoning variances and approvals in the face of the board's adoption of discriminatory Local Law No. 2 of 1990. Defendants' arguments to the contrary are unconvincing. Consequently, the costs and attorneys fees for this work are compensable. Support Ministries has submitted a detailed bill totalling $17,004.95 from the law firm for services rendered prior to the commencement of this litigation. (Exhibit P–38). The court has examined the bill, finds it to be reasonable, and grants plaintiff Support Ministries that amount as part of their damages.

### 3. Monetary Damages to New York State

■ This court has no doubt that defendants' discriminatory conduct which delayed the establishment of an adult care facility for PWAs has also caused monetary damage to New York State. Testimony was adduced that indicates that there are some PWAs who have been hospitalized who might have qualified for admission to the Waterford facility. However, this court agrees with defendants that insufficient proof was presented at trial for this court to determine a specific damage figure. Any figure that this court would award to the State would have to be based on speculation. Accordingly, no monetary award will be made to the State.

### 4. Costs and Attorney's Fees Plaintiffs Incurred Due to This Litigation and Punitive Damages

The court may award plaintiffs punitive damages, 42 U.S.C. § 3613(c)(1), and "in its discretion, may allow the prevailing party ... a reasonable attorney's fee and costs." 42 U.S.C. § 3613(c)(2). As agreed by the parties prior to trial, the propriety and amount of such awards will be the subject

of further briefing by the parties and a hearing if required.

IT IS SO ORDERED.